IN THE MATTER OF A JOHN DOE GRAND JURY
INVESTIGATION.

Suffolk. May 8, 1991. - July 9, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, & O'CONNOR, JJ.

*Newsman. Evidence*, Privileged communication. *Constitutional Law*, Free-
   dom of speech and press. *Grand Jury*.

A Superior Court judge, who was considering motions to quash grand jury
   subpoenas issued to two news reporters to discover the identities of con-
   fidential news sources, properly undertook to weigh the public interest
   in having every person's evidence available against the public interest in
   the free flow of information, where the reporters had demonstrated that
   their claim of damage to the free flow of information was more than
   speculative and theoretical. [599-600]
A Superior Court judge properly allowed motions to quash grand jury sub-
   poenas issued to two news reporters for the purpose of discovering the
   identities of confidential news sources, where the low likelihood of bene-
   fit to the grand jury from the revelation of the sources balanced against
   the public interest in encouraging the dissemination of information led
   to the conclusion that the grand jury had no right to insist on the re-
   porters' testimony. [600-602]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on February 26, 1991.

The case was heard by *Greaney*, J.

*Thomas J. Mundy, Jr.* (*Susan Underwood*, Assistant Dis-
trict Attorney, with him) for the Commonwealth.

*M. Robert Dushman* for Patricia Mangan.

*Evan Slavitt* (*Susan M. Prosnitz* with him) for David
Ropeik.

WILKINS, J. Once again we confront a case involving the
desire of a grand jury to learn the identity of the confidential
source of certain information that a news reporter has pub-
lished. A Superior Court judge allowed motions to quash

grand jury subpoenas issued to two reporters. The Commonwealth unsuccessfully sought relief under G. L. c. 211, § 3 (1990 ed.), from a single justice of this court and has appealed from the single justice's order denying relief. We affirm the order.

The investigation by a grand jury of the county of Suffolk concerns the death of Carol DiMaiti Stuart on October 23, 1989, and the death several days later of her son who was delivered by emergency Caesarean section. Her husband Charles sustained a gunshot wound but survived. The police first focused their attention on a black male whom Charles identified in a police lineup. Early in January, 1990, however, the grand jury heard testimony that Charles had shot his wife and that Charles's brother Matthew had unwittingly participated in the killing of Carol by concealing certain evidence on the night of the shooting as part of what Matthew claimed was an insurance fraud. According to that evidence, Matthew drove to a prearranged spot in the Mission Hill section of Boston, drove up beside Charles's motor vehicle, and took from Charles a bag containing Carol's purse, her engagement ring, and a gun.

On January 3, 1990, Matthew reportedly told the police that Charles had shot Carol. The next day Charles committed suicide. The investigation into the deaths of Carol Stuart and her son turned to the conduct of Matthew Stuart and his friend John McMahon, who may have accompanied Matthew to Mission Hill on October 23, 1989.

More than eighty witnesses have appeared before the grand jury. The police and assistant district attorneys have interviewed every member of the Stuart family and have spoken with "virtually every person that had any connection to Charles and Matthew Stuart, John McMahon, their families, friends, girlfriends, employers, and fellow employees." Not every person who has been interviewed has testified before the grand jury.

The grand jury summoned David Ropeik, a reporter for television station WCVB, channel 5 in Boston, to discover the identity of a "source close to the Stuart family," whom

he had quoted in an October 16, 1990, broadcast. Ropeik claimed that that source had told him that Charles Stuart had confessed to murdering Carol Stuart and that Charles had also said that Matthew had brought the gun to Mission Hill on the night of the murder. The jury saw a videotape of the channel 5 program. The other reporter whom the grand jury summoned is Patricia Mangan, who contributed to a January 7, 1990, story published by the Boston Herald. That story stated that "a Stuart family source told the Herald that [John] McMahon was with Matthew [Stuart] when Charles tossed the bag in the car but that McMahon did not play a major role in the incident."

News reporters do not have a constitutionally based testimonial privilege that other citizens do not have. See *Branzburg* v. *Hayes*, 408 U.S. 665, 690 (1972); *Petition for the Promulgation of Rules Regarding the Protection of Confidential News Sources & Other Unpublished Information*, 395 Mass. 164, 171 (1985) (hereafter *Petition for Promulgation of Rules*); *Commonwealth* v. *Corsetti*, 387 Mass. 1, 4 (1982). There is no such statutory privilege, nor is there any rule of court providing such a privilege. *Petition for Promulgation of Rules, supra*. We have, however, recognized that common law principles may justify the denial of enforcement of a grand jury summons issued to a news reporter. See *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 586-587, cert. denied, 488 U.S. 980 (1988) (no abuse of discretion in recognizing common law privilege); *Petition for Promulgation of Rules, supra* at 170-171 (among other things, judge must "consider the effect of compelled disclosure on values underlying the First Amendment and art. 16"); *Commonwealth* v. *Corsetti, supra* at 5-6 (no common law privilege to decline to testify where source has been described and information made public); *Matter of Roche*, 381 Mass. 624, 638-640 (1980) (common law privilege might be recognized but was not claimed).

Although this is an appeal from an order of a single justice of this court, we in effect review the motion judge's conclusion that, on common law principles, the subpoenas should be

quashed. The order allowing the motions was a final order not reviewable by any established procedure, and the Commonwealth, therefore, appropriately challenged the order by a complaint seeking relief under the general superintendence power of this court (G. L. c. 211, § 3). The participation of the single justice does not involve a significant, second exercise of discretion that the Commonwealth must overcome because, if the motion judge's order was unlawful, the single justice had no discretion to deny the Commonwealth relief.

The motion judge recognized the balancing principles stated in *Petition for the Promulgation of Rules, supra* at 172, that call for weighing (a) the public interest in having every person's evidence available against (b) the public interest in the free flow of information. Although this analysis may take place in connection with a challenge to a subpoena pursuant to Mass. R. Civ. P. 26(c), 365 Mass. 772 (1974) (see *Sinnott* v. *Boston Retirement Bd., supra* at 583-584), the standard to be applied normally calls for a "more clearly defined protection against intrusive discovery than that provided by the discretionary supervision contemplated by [rule] 26(c)" (see *Matter of Roche, supra* at 639). The distinction may be important in certain cases. If a subpoena were to be quashed by applying rule 26(c) or grand jury supervisory principles, a judge would not have to reach any reporter's common law privilege issue. Here we are not concerned with rule 26(c) (which applies to civil actions) or with grand jury supervisory objections to the subpoenas but rather with the larger test discussed in *Petition for the Promulgation of Rules.*

The first inquiry is whether the unwilling witness has made "some showing that the asserted damage to the free flow of information is more than speculative or theoretical." *Id.* at 172, citing *Matter of Roche, supra* at 635, and *Matter of Pappas,* 358 Mass. 604, 612 (1971), aff'd sub nom. *Branzburg* v. *Hayes,* 408 U.S. 665 (1972). The Commonwealth points out that the motion judge did not explicitly make this initial determination. In the discussion of the balancing test in the judge's memorandum of decision, however,

he explicitly concluded that the asserted damage to the free flow of information was more than "speculative or theoretical." He was warranted in doing so. He observed that the reporters would not have received the information they obtained if they had not promised anonymity to their sources and that the reporters' future news-gathering ability, both generally and in the case being investigated by the grand jury, would be impaired if they violated their promises. See *Sinnott* v. *Boston Retirement Bd.*, *supra* at 587. Because the reporters demonstrated that their claim of damage to the free flow of information was more than speculative and theoretical, the judge properly undertook the balancing test outlined by our cases.[1] See *Petition for Promulgation of Rules*, *supra* at 172; *Sinnott* v. *Boston Retirement Bd.*, *supra* at 586; *Matter of Corsetti*, *supra* at 5-6; *Matter of Roche*, *supra* at 640.

In assessing the public interest in obtaining the evidence, that is, the names of the reporters' sources, the judge recognized that he should consider the circumstances of the grand jury inquiry and the pertinence to the inquiry of the evidence sought. The judge concluded that the information sought from Ropeik and Mangan was cumulative or otherwise available. He said that the district attorney's office knew of all sources of the information and that it was unnecessary to subpoena the reporters.

The judge's analysis does not recognize that after investigation, and the grand jury testimony of sources close to the Stuart family, the grand jury has not discovered who made the statements that the reporters published. Evidence from the reporters' sources that Matthew brought the murder weapon to his brother, and that McMahon was with Matthew, could have a significant bearing on the issues before the grand jury. There is no basis on the record for the judge's conclusion that the information sought was cumulative. The

---

[1]The burden is on the unwilling witness to show that the subpoena should be quashed. *Matter of Pappas*, *supra* at 614. Because of the judge's findings and the substantially uncontested underlying facts, the placing of the burden of persuasion is not important here.

testimony of the reporters' sources would not be cumulative of the reporters' own testimony of what their sources told them. The judge's further conclusion that the names of the sources were otherwise available was correct only in the sense that in all probability the sources were in the group of people who had already testified.

Because we do not agree with the judge's conclusion that the evidence sought from the reporters was cumulative and because his conclusion that that evidence was otherwise available is correct only in a limited sense, we shall conduct our own balancing test. Normally, in such a situation, we would remand the case to the motion judge for reconsideration. Here, however, the Commonwealth has asked us to perform the balancing test if we disagree with the motion judge's reasoning. It does so, it says, because there was no live testimony before the motion judge and he "is in no better position than this Court to decide the issue."

We may fairly assume that the sources ("a source close to the Stuart family" and "a Stuart family source") were among the more than eighty persons who were called before the grand jury. We are told that each such witness was asked about the subject of the news reports by Ropeik and Mangan, although we do not have in the record the precise questions asked. None admitted having knowledge of the underlying facts in either news report. Thus, in a sense, the sources of the information were available, as the judge said, but the sources would not disclose the information when under oath.

Although the grand jury properly could consider the reporters' testimony that a particular person made a particular statement, even though that statement is hearsay (see Mass. R. Crim. P. 4(c), 378 Mass. 849 [1979]), the value of the reporters' testimony would be minimal. The reporters' statements are not apt to be admissible at trial to prove the facts stated by their sources because no hearsay exception appears likely to justify their admission.

The prosecution's interest, therefore, in removing one layer of hearsay is obvious. Neither the reporters nor their sources were eyewitnesses to the events described by the sources. The

sources, if identified by the reporters, have testified under oath that they did not know of the information in the news stories (and perhaps have testified that they did not make either statement to either reporter). Such a person is not likely, on the advice of counsel, to provide worthwhile contradictory, and possibly self-incriminating, information under oath.

Not knowing who the sources are makes it impossible for us to state definitively that the grand jury's quest is for evidence that would be of little or no value in the prosecution of the crimes committed. It seems, however, to be substantially so. The low likelihood of benefit to the grand jury from the revelation of the sources balanced against the public interest in encouraging the dissemination of information leads us to the conclusion that the grand jury had no right to insist on the reporters' testimony. The judge reached the right result, even though we do not agree with each aspect of his analysis.

The order quashing the subpoenas is affirmed.

*So ordered.*