EDWARD WOJCIK & another[1] *vs.* BOSTON HERALD, INC.,
& others.[2]

No. 03-P-479.

Bristol. June 10, 2003. - February 26, 2004.

Present: MASON, GRASSO, & GREEN, JJ.

*Practice, Civil,* Interlocutory appeal, Discovery. *News Reporter. Evidence,*
Privileged communication. *Constitutional Law,* Freedom of speech and
press.

A Superior Court judge in a defamation action exceeded the bounds of his
discretion and erred in issuing an order that compelled disclosure of the
identities of "confidential" sources who furnished information contributing
to certain published newspaper stories, where it was premature on the
present record to conclude that the plaintiffs' claim of defamation depended
in any demonstrated manner on the identities of the sources for the
newspaper stories. [513-517] GRASSO, J., dissenting.

. CIVIL ACTION commenced in the Superior Court Department on
September 4, 2001.

Motions to compel discovery and for a protective order were
heard by *Paul E. Troy,* J.

A proceeding for interlocutory review was heard in the Ap-
peals Court by *Kafker,* J.

*M. Robert Dushman* for the defendants.

*Philip N. Beauregard (Michael Franco* with him) for the
plaintiffs.

GREEN, J. Though no privilege allows a newspaper reporter to
refuse a discovery request seeking the identity of the source of
an allegedly libelous statement, we agree with the defendants that
a judge of the Superior Court erred in ordering them to disclose
the identities of the "confidential" sources who furnished

---

[1]Debra Wojcik.
[2]Ellen Silberman, Cosmo Macero, and Karen Crummy.

information contributing to the published newspaper stories at issue in the present case.

*Background.* In 1999, the plaintiff Edward Wojcik was employed by the State Lottery Commission (Lottery) in its Fairhaven office. On August 30 of that year, he was suspended, pending an internal investigation, due to suspicion that he had stolen Lottery "scratch tickets" discovered missing, and had redeemed winning tickets he found among them. On September 21, Wojcik was fired. On various occasions during its investigation, Lottery officials issued press releases explaining that it had suspended certain employees (whom it did not name publicly) "under investigation" for suspicion of stealing scratch tickets. It is undisputed that Wojcik was one of the suspended employees. At the time of Wojcik's termination, the Lottery ascribed his termination to "failure to meet standards and for violating Lottery policies and procedures." Wojcik's termination was subsequently upheld in arbitration, but solely on the ground that, contrary to Lottery policy prohibiting employees from playing any Lottery games, he had played Lottery tickets (not that he had stolen them). Wojcik denies any involvement in stealing scratch tickets.

Beginning on September 3, 1999, and thereafter over the next several weeks, the defendant newspaper published a series of attention-getting news articles, written by the individual defendant reporters, regarding the alleged theft.[3]

Wojcik sued the Lottery and various of its officials in United

---

[3]The first such article appeared atop the front page of the September 3, 1999, edition, under a headline that read "Lottery duo allegedly cashed in for scratch." Authored by defendants Ellen Silberman and Cosmo Macero, the second and third paragraphs of the article read as follows:

"Sources told the [Boston] Herald yesterday that Ed Wojcik and Greg Buckley were suspended Monday from their jobs at the Lottery's Fairhaven regional office after the latest explosive evidence of new Lottery plundering began to emerge.

"In the scam — sources said — books of instant tickets would be scratched soon after delivery from the Lottery supplier, but before they were 'scanned in' or activated. Winning batches were cashed in and subsequently paid for at face value. The losers were dumped in the trash."

Additional articles appeared on September 4, September 16, September 17, and September 22. The September 22 article, written by defendant Silberman,

States District Court, claiming (inter alia) defamation and violations of civil rights. During discovery in that action, Wojcik deposed many Lottery officials, each of whom disclaimed knowledge of who had acted as sources for the stories published by the newspaper. Summary judgment entered against Wojcik on his Federal claims, and the case was remanded to the Superior Court.[4] In September, 2001, Wojcik filed the present action against the defendant newspaper and reporters.[5] Wojcik requested, among other discovery, disclosure of the sources on whom the newspaper relied in publishing its allegations against Wojcik. In response, the defendants objected to the requests for production of documents insofar as they requested "documents whose production would disclose the identities of confidential sources," and refused to answer interrogatories requesting such disclosure.[6] Wojcik moved to compel a more complete response, and a judge of the Superior Court allowed the motion, ordering the defendants to disclose the identities of their sources.[7] The

reported Wojcik's firing of the previous day. It explained (in two nonconsecutive paragraphs):

> "[Treasury spokesman Dwight] Robson would not elaborate on the reasons for their termination, but sources said Buckley and Wojcik were allegedly scratching instant tickets before they were available to the public.

> "Sources said Buckley, an administrator in the Fairhaven office, and Wojcik, a field service manager responsible for providing and fixing equipment such as Lottery sales terminals, would allegedly take — and scratch — books of instant tickets soon after they were delivered from the Lottery supplier, but before they were 'scanned in' or activated."

A later article, authored by the defendant Karen Crummy, appeared on November 10, 2000.

[4]The judgment dismissing the Federal claims was affirmed on appeal. See *Wojcik* v. *Massachusetts State Lottery Commn.*, 300 F.3d 92 (1st Cir. 2002).

[5]The complaint was in three counts: defamation; invasion of privacy; and loss of consortium. The parties have engaged the issue involved in the present appeal principally through the lens of the defamation count.

[6]The relevant interrogatories and answers are set out in full in an Appendix following the court's majority and dissenting opinions. *Post* at 524. The record on appeal does not include the documents produced, though the defendants' response to the request for production of documents states that they would produce documents which do not disclose the identities of confidential sources.

[7]The judge correspondingly denied the defendants' motion for a protective order.

defendants sought interlocutory review under G. L. c. 231, § 118, and the single justice reported the question for plenary review.[8]

*Discussion.* On appeal from an interlocutory discovery order, we review for abuse of discretion. See *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. 384, 387 (1999). See also *Matter of Roche*, 381 Mass. 624, 638 (1980). Cf. *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 585, cert. denied sub nom. *Sinnott* v. *Radin*, 488 U.S. 980 (1988). Of course, the standard "abuse of discretion" admits of numerous meanings in different contexts, see *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 386 n.8 (2000); in the present case, the motion judge's discretion is bounded by important values under the First Amendment to the United States Constitution. See *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 598 (1st Cir. 1980).

In his order, the motion judge displayed his understanding of the need in the circumstances to balance "the public interest in every person's evidence and the public interest in protecting the free flow of information." *Petition for the Promulgation of Rules Regarding the Protection of Confidential News Sources & Other Unpublished Information*, 395 Mass. 164, 172 (1985).[9] The judge concluded that the plaintiffs' need for the requested discovery to carry the burden of proof on their claims

---

[8]The ordinary path to appellate review of an order compelling disclosure of a reporter's sources follows an adjudication of contempt. See *Matter of Roche*, 381 Mass. 624, 625 n.1 (1980); *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. 384, 387 (1999). Compare *Cronin* v. *Strayer*, 392 Mass. 525, 528-530 (1984) (order compelling discovery is not appealable prior to adjudication of contempt). The election to refer the present interlocutory appeal for plenary review was within the authority of the single justice. See *Mancuso* v. *Mancuso*, 10 Mass. App. Ct. 395, 401 n.6 (1980); *Manfrates* v. *Lawrence Plaza Ltd. Partnership*, 41 Mass. App. Ct. 409, 412 (1996).

[9]Though there is no constitutional, statutory, or common-law privilege protecting a news reporter against such disclosure, "[i]t is well settled that, in supervising discovery, a presiding judge is 'obliged to consider the effect that compelled discovery would have on "the values protected by the First Amendment, [even] though [these values were] entitled to no constitutional privilege." ' *Matter of Roche*, [381 Mass.] at 636, quoting *Herbert* v. *Lando*, 441 U.S. 153, 180 (1979) (Powell, J., concurring). The 'needless disclosure of confidential relationships,' *Matter of Roche, supra* at 637, is, therefore, to be avoided." *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. at 388, quoting from *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. at 586.

outweighed the potential harm to the newspaper's ability to gather information by reliance on confidential sources.[10]

The motion judge described the identities of the defendant reporters' sources as "central" to the plaintiffs' claim, explaining that "[w]ithout disclosure of the sources, the plaintiffs will have no way to investigate . . . whether the defendants were reasonable in crediting the accuracy of the information provided to them."[11] It is at this juncture that we depart from the judge's analytical course: the relevance of the sources' identities to the plaintiffs' claim is not apparent to us on the present record, at least so far as the record is now developed. If the articles are libelous in the manner the plaintiffs claim, the libelous character of the articles does not appear to rest so much on the accuracy of what the reporters contend they were told by unnamed sources, but on what the reporters wrote.

Assuming (without deciding) that all of the articles asserted, in substance, that Wojcik had in fact engaged in a "scam" for the theft of scratch tickets,[12] the interrogatory responses that formed the basis for the plaintiffs' motion to compel are decidedly unclear on the extent to which the reporters attribute such an accusation to any source. In response to Wojcik's interrogatory no. 2, which requested detailed information regarding each communication by the reporters concerning Wojcik and the Lot-

---

[10]Before conducting the balancing test, the motion judge concluded that the defendants had made an adequate showing of potential damage to the free flow of information as a result of the requested disclosure. See *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. at 388-390. We agree with the judge's conclusion.

[11]The tort of libel (involving a private plaintiff) requires (i) publication (ii) of false and defamatory information (iii) with negligent care for the veracity of the information. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975). The motion judge assumed that the plaintiff was not a public figure, for whom the third element would require an intentional or reckless disregard for the truth. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964). In the present case, the differing burden of proof between public and private claimants does not bear on the relevance of the identities of the sources to the plaintiffs' claim.

[12]The defendants argue that the articles published on September 3, 4, 16, and 17 asserted merely that Wojcik was suspended, pending investigation into whether he had engaged in the alleged theft. It is at least arguable that the articles, read in their entire context, suggested much more. In any event, the September 22 article includes an assertion that Wojcik actually stole Lottery tickets for personal gain.

tery's Fairhaven office, the defendant Silberman attributed to confidential sources the assertions that (i) two Lottery employees were suspended with pay pending investigation; (ii) the employees denied wrongdoing and that the Lottery had not determined whether any money was missing; (iii) a particular named Lottery supervisor "was not really involved but that two men who worked for him were involved"; and (iv) after approximately two weeks, the supervisor had retired and the Lottery had found sufficient cause to terminate the other two employees.

It is unclear at the present limited stage of discovery precisely what Silberman claims to have been told by her sources, and precisely how it relates to the essential elements of Wojcik's defamation claim. If by reference to the assertion described in clause (iii)[13] Silberman contends that one or more sources told her that Wojcik took and scratched lottery tickets (as she reported in her article), the plaintiffs are likely entitled to disclosure of the identities of the sources, both to explore whether the sources confirm or contest Silberman's version of their conversations and to determine whether Silberman exercised due care in verifying the information she received from the sources before publishing it. However, if the unnamed "confidential" sources merely told Silberman that Wojcik was suspended pending an internal investigation (the truth of which is undisputed), the identities of the sources are largely irrelevant to Wojcik's defamation claim; if the articles are libelous, their libelous character results from deviations between what Silberman was told and what she wrote. Further discovery, including Silberman's deposition, will likely clarify what Silberman contends she was told by her unnamed sources and the extent to which the articles as written relied on that information, and will thereby illuminate whether the identities of her sources are in fact essential to Wojcik's claim.[14]

That is not to say that the plaintiffs were not entitled to some

---

[13]Of the remaining assertions attributed to sources in Silberman's response, the parties do not appear to contest the truth of the assertions described in clauses (i), (ii), and (iv).

[14]Macero's response to interrogatory no. 2 is similarly unclear. He states that an unnamed source (whom he describes as "Source 2") "provided the names of the state employees suspected of wrongdoing and provided clarity to

relief on their motion to compel. The defendants' responses to the plaintiffs' requests for answers to interrogatories were plainly inadequate. For example, Silberman refused to furnish any substantive response to interrogatory no. 3, which sought, in addition to the identity of each source referenced in the articles, the substance of her communications with them.[15] Macero's responses were evasive and uninformative on the specific substance of his communications with his unnamed sources; whatever question there may be about the importance of the sources' identities, there is no question that the substance of the information they furnished to the reporters lies at the very center of the plaintiffs' claim. Furthermore, without disclosing the identities of the sources themselves it would be illuminating, for purposes of the plaintiffs' claim, to determine whether the unnamed sources were employees or officers of the Lottery (or, alternatively, perhaps of an outside auditor), and whether they claimed to have direct personal knowledge of the information they provided. The discovery process is not a game of cat and mouse, and the defendants may not evade the plaintiffs' inquiries into relevant and discoverable material merely by invoking overbroad reference to the First Amendment. An order compelling more complete answers to the plaintiffs' interrogatories, and awarding other sanctions (such as attorney's fees incurred in pursuing the motion to compel), however, would punish the defendants' inadequate discovery responses while still recognizing the First Amendment considerations bounding the exercise of the motion judge's discretion.

As to the narrower question of the disclosure of the sources' identities, however, it is premature on the present record to conclude that the plaintiffs' claim of defamation depends in any demonstrated manner on the identities of the sources for the defendants' published stories. See *Bruno & Stillman, Inc.* v.

other basic facts and information obtained from confidential sources or sources identified in articles, including Source 1. Source 2 may also have discussed the type of action that would possibly be taken in response to the situation, including the potential penalties against the employees."

[15]To the extent that the substance of such communications is embraced entirely within Silberman's response to interrogatory no. 2, she should say so; to the extent there were any additional communications or any other matters of substance discussed, she should provide that information.

*Globe Newspaper Co.*, 633 F.2d at 598-599.[16] Without a demonstrated essential relationship between the identities of the reporters' sources and the elements of the plaintiffs' claim, the motion judge's order compelling disclosure of the identities of the sources exceeded the bounds of his discretion in the circumstances, and was in error.[17] We accordingly vacate so much of the Superior Court order as compels disclosure of the identities of the reporters' sources, and remand the matter to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

GRASSO, J. (dissenting). I dissent because, in my view, the motion judge did not abuse his discretion in ordering the defendants to disclose the identities of confidential sources. See *Dow Jones & Co.* v. *Superior Ct.*, 364 Mass. 317, 322 (1973) (discovery order in libel action reversible only for abuse of discretion); *Matter of Roche*, 381 Mass. 624, 638 (1980) (discovery order entitled to broad measure of discretion). The decision-making process was conducted within the established framework of relevant legal standards and took into account "all the proper factors identified by relevant case law as necessary to inform the discretionary exercise." *Long* v. *Wickett*, 50 Mass. App. Ct. 380, 386 n.8 (2000).

---

[16]It is in that respect that the present case is distinguishable from *Dow Jones & Co.* v. *Superior Ct.*, 364 Mass. 317 (1973), on which the dissent relies. In that case, the article forming the basis of the plaintiff's libel claim quoted an unnamed town official as stating that the plaintiff "was a 'bad word' in Stoneham and . . . was in fact using the law to 'blackmail' the town officials." *Id.* at 318. The essential connection between the plaintiff's claim and the identity of the source was clearly established, without need of further exploration.

[17]Contrary to the suggestion advanced by the dissent, we do not impose a requirement that disclosure of source identity be deferred until all other discovery from nonconfidential sources has been exhausted. See *post* at 518. Instead, we conclude simply that disclosure ordinarily should not be required absent demonstration of an essential relationship between the identities of the sources and the plaintiffs' ability to establish an element of their claim. On the present state of discovery, the plaintiffs have not demonstrated such a relationship; whether such a relationship exists or not will depend on the results of further discovery.

The judge's memorandum of decision demonstrates careful attention to the competing interests when the public interest in the free flow of information butts against "the equally compelling public interest in securing all evidence necessary to fair and accurate adjudication."[1] *Matter of Roche, supra* at 640. See *Petition for the Promulgation of Rules Regarding the Protection of Confidential News Sources & Other Unpublished Information*, 395 Mass. 164, 170-172 (1985) (*Petition for Promulgation of Rules*). The judge considered the factual context, the issues in dispute, the measures already taken by the plaintiffs, the need for the information sought, and the alternatives to disclosure.

Regrettably, the majority substitutes its assessment for that of the motion judge. More troubling still, the majority holds that the judge abused his discretion because he ordered disclosure of confidential sources when the discovery record was inadequate to determine whether the defendants had relied on confidential sources. The underpinning for this holding is an overly exacting parsing of discovery material that subtly transforms the balancing test set forth in *Petition for Promulgation of Rules, supra*, by shifting the burden at the second stage of the analysis from the party seeking to avoid disclosure (the defendants) to the party seeking disclosure (the plaintiffs). The majority's approach establishes a sequencing of discovery that will undoubtedly become the rule of thumb in defamation cases against newspapers: before a motion to compel disclosure may lie, a plaintiff must first move to compel further answers to interrogatories and then depose the defendants — notwithstanding the need for disclosure; pointed interrogatories and document production requests; and unequivocal refusal to disclose the identities of sources essential to the plaintiffs' action.

To date, the Supreme Judicial Court has rejected an exhaustion requirement prior to ordering disclosure of confidential

---

[1]The balancing principles set forth in *Petition for the Promulgation of Rules Regarding the Protection of Confidential News Sources & Other Unpublished Information*, 395 Mass. 164, 172 (1985), and its progeny provide "more clearly defined protection against intrusive discovery than that provided by the discretionary supervision contemplated by [Mass.R.Civ.P. 26(c), as amended, 423 Mass. 1401 (1996)]." *Matter of a John Doe Grand Jury Investigation*, 410 Mass. 596, 599 (1991), quoting from *Matter of Roche*, 381 Mass. 624, 639 (1980).

sources. See *Dow Jones & Co.* v. *Superior Ct.*, 364 Mass. at 320 (rejecting postponement of discovery order until plaintiff has completed discovery, exhausted alternative means, and demonstrated that he will succeed only if identity of confidential source is revealed). Nothing in *Bruno & Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 598 (1st Cir. 1980), on whose authority the majority relies heavily and which predates the carefully developed balancing test of *Petition for Promulgation of Rules*, *supra*, requires such a result.

1. *Factual context.* After reviewing various Boston Herald articles, the motion judge concluded that the articles were arguably defamatory because they accused Wojcik of a crime. With this assessment, the majority does not seriously disagree.[2] See *ante* at 514. Nor does it dispute that the judge properly took note of Wojcik's unsuccessful efforts to determine the identities of the confidential sources by deposing many Lottery officials in a related Federal action.[3]

2. *Application of the balancing test.* At stage one of the balancing test, the majority and I agree, the motion judge did not err in concluding that the defendants met their burden of demonstrating that the risk that disclosure posed to the free flow of information was more than speculative or theoretical. See *Matter of a John Doe Grand Jury Investigation*, 410 Mass. 596, 600 (1991); *Ayash* v. *Dana-Farber Cancer Inst.*, 46 Mass. App. Ct. 384, 389-390 (1999) (forced disclosure of investigative news reporters' confidential sources carries inherent threat to free flow of information).

It is at stage two, the majority contends, where the judge went off track. The judge reasoned that the identities of confidential sources was relevant, material, and essential to Wojcik's defamation action because certain of the articles accused Wojcik of criminality and did so based on information provided by confidential sources: "The only support for the charges of 'theft' and 'plundering' printed by the [Boston] Herald are the supposed statements made by confidential sources

---

[2]The majority assumes, without deciding, the defamatory nature of these articles.

[3]See *Wojcik* v. *Massachusetts State Lottery Commn.*, 300 F.3d 92, 103-104 (1st Cir. 2002).

to whom only the [Boston] Herald has access." The sources' identities were central to Wojcik's claim because without knowledge of their identities, Wojcik could not demonstrate that the defendants were negligent in verifying the truth or falsity of the material published, a necessary component of his defamation claim. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858-859 (1975).

In my view, the record fully supports the motion judge's determination that the balance of considerations did not tip toward the defendants, the parties seeking to avoid disclosure. See *Petition for Promulgation of Rules*, 395 Mass. at 172; *Matter of a John Doe Grand Jury Investigation*, supra at 600 n.1 (at step two balancing, burden on party opposing disclosure). The judge's assessment of the relative weight of the competing public interests cannot be said, as matter of law, to be incorrect, especially in a defamation action where the identities of confidential sources are integral to the plaintiffs' proof that the defendants acted negligently in relying on the information supplied. Compare *Dow Jones & Co.* v. *Superior Ct.*, 364 Mass. at 319-320 (identity of confidential source central to libel action), with *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. 581, 584 n.3, cert. denied sub nom. *Sinnott* v. *Radin*, 488 U.S. 980 (1988) (identities of sources not at heart of action for invasion of privacy).

I disagree with the majority that "[i]f the articles are libelous in the manner the plaintiffs claim, the libelous character of the articles does not appear to rest so much on the accuracy of what the reporters contend they were told by unnamed sources, but on what the reporters wrote." *Ante* at 514. It is not enough to say, as the majority does, that the defendants may be liable for what they wrote, apart from what they were told by confidential sources. There are a number of bases on which the defendants may be liable. They may be liable for reporting inaccurately what was related by a source (either confidential or nonconfidential); they may be liable for publishing a defamatory article that references a fictional confidential source; or they may be liable for publishing a defamatory article that negligently relies on an unreliable confidential source. Especially to prove the latter, the plaintiffs must know the identity of each confidential

source. The plaintiffs' proof cannot be limited by the defendants' unwillingness to provide the identities of confidential sources that the defendants acknowledge exist and on whom their articles purport to rely.

To reach its conclusion that the defendants may not have relied on confidential sources, the majority engages in a curious reading of the defendants' answers to discovery requests that essentially shifts the burden of proof at stage two from the party opposing discovery to the party seeking it. See *Petition for Promulgation of Rules*, 395 Mass. at 172; *Matter of a John Doe Grand Jury Investigation, supra* at 600 n.1. To demonstrate that disclosure of the identities of confidential sources is necessary, the majority would require the plaintiffs to depose the defendants to prove reliance on confidential sources. However, the defendants' discovery responses make no suggestion whatsoever that confidential sources were not relied on. To the contrary, the articles themselves unequivocally assert that confidential sources were used. If the defendants did not rely on confidential sources for the defamatory assertions, requiring them to say so in answers to interrogatories and document production requests imposes no burden on First Amendment values. Because the defendants made no such disclaimer, the more reasonable inference is that they did rely on confidential sources and that disclosure of the sources is required because the propriety of that reliance is central to the plaintiffs' case.[4]

The majority's conclusion, that it is unclear whether confidential sources were relied on, rests on a strained interpretation of the defendants' answers to interrogatories that reads the answers in isolation from each other[5] and ignores the context supplied by accusations in the challenged articles. Most notable is a September 22 article that states, in pertinent part: "Sources said . . . Wojcik, a field service manager responsible for providing and fixing equipment such as Lottery sales terminals, would allegedly take — and scratch — books of

[4]The majority itself concedes that the plaintiffs are likely entitled to disclosure of the identities of the confidential sources if they were relied on by the reporters. *Ante* at 515.

[5]The interrogatories and responses are included as an Appendix following this opinion. *Post* at 524.

instant tickets soon after they were delivered from the Lottery supplier, but before they were 'scanned in' or activated." The article clearly accuses Wojcik of a crime and is unambiguous in its attribution to confidential sources of the assertion of criminality.

If there is any lack of clarity regarding the extent of the defendants' reliance on confidential sources, what the confidential sources said, and "precisely" how the confidential sources relate to Wojcik's defamation claim, the obscurity lies in the calculated nature of the responses, not in Wojcik's failure to pose the questions (or to make the proper document requests). The answers are crafted to provide limited detail and to prevent deduction of the sources of the information.[6]

3. *Alternatives to forced disclosure.* The defendants suggested three alternative to disclosure: (1) precluding the defendants from relying on the identities of the confidential sources; (2) postponing disclosure until completion of further discovery and defendants' motion for summary judgment; and (3) requiring Wojcik to exhaust nonconfidential sources. The motion judge considered, and properly rejected, each suggested alternative.

First, because Wojcik bears the burden of proving that the defendants were unreasonable in relying on the confidential sources, the *identities* of the sources are an essential component of the reliability assessment; preventing the defendants from relying on the identities of confidential sources ignores the plaintiffs' burden. Second, without knowledge of the sources' identities, Wojcik could not demonstrate a genuine issue of material fact as to the defendants' negligence in order to defeat the defendants' summary judgment motions. Finally, given Wojcik's unsuccessful discovery efforts in the Federal litigation, other than disclosure by the defendants, no feasible alternative

---

[6]Defendant Silberman's answer to interrogatory no. 3 does not state that confidential sources were not relied on. Rather, the answer states: "Silberman objects to Interrogatory No. 3 on the grounds that it calls for the disclosure of confidential information."

Similarly, the defendants' responses to the request for document production assert, in pertinent part: "Defendants object to this request insofar as it requests (1) documents whose production would disclose the identities of confidential sources . . . ."

exists to discover the identities of the sources.[7] The judge concluded: "It is inherent in the nature of the confidential relationship between the paper and its sources that no other party has knowledge of the sources' identities." The judge's determination was not error, much less an abuse of discretion. See *Dow Jones & Co.* v. *Superior Ct.*, 364 Mass. at 320; *Sinnott* v. *Boston Retirement Bd.*, 402 Mass. at 586-587.

The majority, however, maintains that forced disclosure is premature absent further discovery, in particular, the depositions of Silberman and Macero. The majority goes so far as to suggest that the judge should have granted relief that was neither sought by the plaintiffs nor suggested as an alternative by the defendants — compelling further answers to discovery responses. I believe that the majority's approach is incorrect in both respects.

The issue before the motion judge was narrowly focused: whether disclosure must be made. The plaintiffs moved to compel disclosure of confidential sources, not to compel further answers; the defendants opposed disclosure and sought protective orders. However reasonable ordering further answers to interrogatories might have been if requested as an initial matter, there was no such request. Moreover, even had such a request been made, it was within the motion judge's discretion to conclude that further answers to interrogatories were not a viable alternative to disclosure. See *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809 (2003) (on appellate review for abuse of discretion, question is not whether we should have made opposite decision, but whether no conscientious judge, acting intelligently, could honestly have taken view expressed).

Neither side is likely to blink in the future. The plaintiffs will continue to seek disclosure of the identities of the confidential sources. The defendants will continue to assert that the sources' identities are privileged against disclosure. There is no basis for believing that deposing defendants Silberman, Macero, or

[7] In depositions conducted in the Federal action, Lottery officials denied knowledge of the confidential sources. Nothing more can reasonably be expected by requiring further depositions of these individuals in the current action. See *Matter of a John Doe Grand Jury Investigation*, 410 Mass. at 602 (person previously providing information under oath unlikely to provide worthwhile contradictory information).

Crummy, and posing questions designed to elicit the identities of the confidential sources, will be met with a different response. There is also no basis for concluding that deposition questions will enable Wojcik to determine whether the defendants relied on confidential sources; whether they did so reasonably; or even whether they reported accurately what the confidential sources related, without accepting on faith the truthfulness of the deponents' answers. The sources themselves must be disclosed if discovery is to have its truth-seeking effect.

Such preconditions to compelled disclosure as the majority requires will impose significant burdens, financial and otherwise, on an individual such as Wojcik who alleges defamation by a newspaper. I am not unmindful that the stakes are high for the defendants as well. An order requiring disclosure of the confidential sources' identities will, if not met, result in a request for sanctions, including awarding plaintiffs judgment as to liability on their defamation claim. See Mass.R.Civ.P. 37(b)(2)(C), as amended, 390 Mass. 1208 (1984). Cf. *Keene* v. *Brigham & Women's Hosp., Inc.*, 56 Mass. App. Ct. 10, 16 (2002), *S.C.*, 439 Mass. 223 (2003). These issues, however, are not before us and, absent enactment of a newspaper reporter's privilege against disclosure of confidential sources, will continue to be part of the legal landscape.

APPENDIX TO THE COURT'S MAJORITY AND DISSENTING OPINIONS.[1]

Interrogatories

*Interrogatory No. 2*
"Please identify each communication that you had from August 1, 1999 to date concerning Edward Wojcik and/or the Lottery's Fairhaven office. Please list the communications in chronological order. For each communication, please state:

"(a) the date;
"(b) the name and address of each participant;
"(c) whether the communication was oral or written; and
"(d) the substance of the communication."

---

[1]Reproduced here are interrogatory nos. 2 and 3, which are identical, and the respective responses of defendants Silberman and Macero. The responses of the defendant Boston Herald, Inc., incorporate by reference the answers of Silberman and Macero.

*Silberman Answer to Interrogatory No. 2*

"Silberman objects to Interrogatory No. 2 on the grounds that it is overbroad and unduly burdensome, it is duplicative of Interrogatory No. 3, and it calls for the disclosure of communications with attorneys or confidential sources that are protected by the attorney-client privilege and/or the attorney work product doctrine or are otherwise confidential. Without waiving these objections, Silberman states as follows:

"On or around September 1, 1999, I had a conversation with Dwight Robson, spokesman for Treasurer Shannon O'Brien and the state Lottery, about a 'serious violation.' Robson's office address is Room 227, State House, Boston, Massachusetts 02133.

"On or around September 1, 1999, I had a conversation with a confidential source who told me that the Fairhaven employees had been suspended with pay for two weeks to give the Lottery time to figure out what to do with the employees. The source also told me that the employees had not admitted any wrongdoing and that the Lottery had not yet determined whether there was any money missing.

"On or around September 2, 1999, I had a [] conversation with a confidential source who told me that Robert Pimental was not really involved but that two men who worked for him were involved.

"On or around September 3, 1999, I had a conversation with Marc La Bella, then the attorney for the Service Employees International Union (SEIU) Local 254, which represents Lottery employees. La Bella told me that nothing had been proven against the Fairhaven employees. La Bella said the union was in negotiations with the Lottery about the Fairhaven employees. He also said he had talked to the three Fairhaven employees. La Bella's current office address is Room 624, Boston City Hall, Boston, Massachusetts 02201.

"On or around September 14, 1999, I had a conversation with Dwight Robson, spokesman for Treasurer Shannon O'Brien and the state Lottery, during which he told me that the Fairhaven employees were no longer being paid by the Lottery and instead were using vacation time. Robson's office address is Room 227, State House, Boston, Massachusetts 02133.

"On or around September 17, 1999, I had a conversation with a confidential source who told me that Robert Pimental was retiring and that the Lottery had found sufficient cause to terminate the other two employees.

"On or around September 17, 1999, I had a conversation with a confidential source who told me that the Fairhaven employees had not admitted anything. Drawing a distinction between Robert Pimental and the other two employees, my source said that Pimental was 'looking the other way' and that 'he wasn't accused of scratching.'

"On or around September 21, 1999, I had a conversation with Edward Wojcik during which he told me that he planned to file a grievance.

"I also had conversations with Cosmo Macero from time to time concerning Edward Wojcik and/or the Lottery's Fairhaven office, but I cannot recall the dates or specific substance of those conversations.

"I do not recall any other specific conversations about Wojcik, other than those protected by the attorney-client privilege."

*Macero Answer to Interrogatory No. 2*

"Mr. Macero objects to Interrogatory No. 2 on the grounds that it is overbroad and unduly burdensome, it is duplicative of Interrogatory No. 3, and it calls for the disclosure of communications with attorneys or confidential sources that are protected by the attorney-client privilege and/or the attorney work product doctrine or are otherwise confidential. Without waiving these objections, Mr. Macero states as follows:

"On or around September 2, 1999, I had multiple conversations with up to three confidential sources. One such source ('Source 1') provided general information about the problems at the State Lottery that had recently been identified in an audit by the Office of the Auditor of the Commonwealth. Specifically, we focused on the problems with security and the integrity of internal controls, particularly at the Lottery's Fairhaven office. I also sought to determine what, if any, steps would be taken by the Office of the Treasurer and Receiver General of the Commonwealth. Source 1 explained the nature of the irregularities that had been discovered. My contact with Source 1 included oral communications and may have also included communications via electronic mail.

"I also had multiple oral communications with [] another confidential source ('Source 2'). Source 2 provided the names of the state employees suspected of wrongdoing and provided clarity to other basic facts and information obtained from confidential sources or sources identified in articles, including Source 1. Source 2 may also have discussed the type of action that would possibly be taken in response to the situation, including the potential penalties against the employees.

"I had at least one oral communication with an additional confidential source regarding the possible types of actions taken and penalties imposed with respect to the individual state employees suspected of wrongdoing. I also confirmed the names of the employees suspected of wrongdoing and the types of conduct being investigated with that source.

"I also had conversations with Ellen Silberman from time to time concerning Edward Wojcik ('Wojcik') and/or the Lottery's Fairhaven office, but I cannot recall the dates or specific substance of those conversations.

"I do not recall any other specific conversations about Wojcik, other than those protected by the attorney-client privilege."

*Interrogatory No. 3*

"Please identify the 'sources' referenced in Boston Herald articles (including, but not limited to, articles published on September 2, 3, 4 and 22, 1999) concerning Edward Wojcik and/or the Lottery's Fairhaven offices. Please include:

"(a) the name and address of each source;
"(b) the dates of the communication with each source; and
"(c) the substance of the communications."

*Silberman Answer to Interrogatory No. 3*

"Silberman objects to Interrogatory No. 3 on the grounds that it calls for the

disclosure of confidential information."

*Macero Answer to Interrogatory No. 3*

"Mr. Macero objects to Interrogatory No. 3 on the grounds that it is duplicative of Interrogatory No. 2 and calls for the disclosure of confidential information. Without waiving these objections, Mr. Macero refers to his Answer to Interrogatory No. 2."