John R. WINEGARD, Petitioner,

v.

Hon. Leo OXBERGER, Judge of the 5th
Judicial District of Iowa, Respondent.

No. 2–58361.

Supreme Court of Iowa.

Oct. 19, 1977.

Rehearing Denied Dec. 19, 1977.

Edward W. Dailey and David A. Hirsch, of Edward W. Dailey Law Offices, P. C., Burlington, for petitioner.

Robert G. Riley and Glenn L. Smith, of Duncan, Jones, Riley & Finley, and Gary G. Gerlach, Des Moines, for Diane Graham and Des Moines Register and Tribune Co., on behalf of respondent.

Robert S. Potter and Robert D. Sack, of Patterson, Belknap & Webb, New York City, for Dow Jones & Co., Inc., amicus curiae.

Stewart, Heartney, Brodsky, Thornton & Harvey, Des Moines, for Iowa Press Ass'n, amicus curiae.

Naomi S. Mercer, Des Moines, for Iowa Broadcast News Ass'n, amicus curiae.

Edward J. Kelly, and E. J. Kelly, of Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for Iowa Broadcasters Ass'n, amicus curiae.

Kermit S. Sutton, of Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for Des Moines Professional Chapter of the Society of Professional Journalists, Sigma Delta Chi, amicus curiae.

RAWLINGS, Justice.

This is an original certiorari proceeding to determine whether respondent judge exceeded his proper jurisdiction or otherwise acted illegally in overruling petitioner's motions to compel discovery of a newsperson, and to sequester a predecree order filed in a pending marriage dissolution action. We sustain the writ.

February 6, 1973, Sally Ann Winegard (Sally) commenced proceedings in Des Moines District Court (District Court) for dissolution of a common-law marriage she claims existed between her and John R. Winegard (Winegard). October 18, 1974, District Court, upon findings of fact and conclusions of law, held a valid marriage existed as between these two persons.

Winegard then unsuccessfully applied to this court for permission to effect an interlocutory appeal. Attached to the application was a copy of the District Court adjudication.

Subsequently, Sally attempted to discover financial information from Winegard. He, in turn, sought declaratory and injunctive relief from such discovery in federal district court. A copy of the interrogatories submitted by Sally to Winegard was there made a part of the latter's pleadings. April 3, 1975, this action was dismissed on jurisdictional grounds.

Meanwhile, Diane Graham (Graham), a Des Moines Register and Tribune Company (Register) reporter assigned to examine the records in Des Moines courts, became conversant with the documents filed in connection with Winegard's federal action. She prepared two articles later published by the Register. They stated in some detail the facts underlying Sally's claim that a common-law marriage existed. Many of the statements therein contained were attributed to Stephen L. Schalk (Schalk), Sally's attorney in the marriage dissolution pro-

ceeding. Thereupon Winegard brought an action for damages in Scott District Court against the Schalk law firm members by reason of asserted invasion of privacy and defamation. The present proceeding is an outgrowth of that action.

March 1, 1975, as an action-related "discovery" approach, Winegard sought to depose Graham and obtain from her or the Register any information obtained and notes made in preparation of the articles. Graham appeared pursuant to subpoena and testified she "substantially wrote" the articles which, to the best of her knowledge, were true and correct. She refused, however, on the basis of rights allegedly guaranteed by the First Amendment to the United States Constitution and article I, section 7, of the Iowa Constitution, to answer questions about conversations with or identity of her sources, preparation of the articles, and procedures followed in editing them.

Graham and the Register then applied to Polk District Court, pursuant to Iowa R.Civ.P. 123, for a protective order quashing the deposition-related subpoenas. Winegard moved to compel discovery under rule 134. April 1, 1975, hearing was had before Judge Leo Oxberger (respondent) on those motions. April 8, 1975, Winegard filed a written renewal of a motion to sequester (made orally at the hearing) and a motion to strike the copy of Winegard's interlocutory appeal application (with District Court's ruling attached), which was Exhibit C of the application for protective order. Graham and the Register resisted.

Judge Oxberger overruled Winegard's motion to compel discovery. He concluded the First Amendment granted Graham a newsperson qualified privilege not to answer Winegard's questions, and in so doing fashioned a four-step test which Winegard was held not to have fulfilled. Respondent judge also denied motions to sequester and strike District Court's ruling, holding the language of Section 598.26, The Code 1973, did not apply to judicial findings of fact and conclusions of law.

June 12, 1975, this court granted certiorari and pursuant to Winegard's motion ordered sealed and sequestered "those papers constituting transcripts of testimony, documents, or proceedings or which copy any part thereof, in the dissolution action" pending this opinion. Included in the sequestration order was Exhibit C about which Winegard complained, together with Sally's interrogatories attached by Winegard to his federal court complaint, Exhibit B of Graham's application.

These are the broadly stated issues here to be resolved:

1. Does Code § 598.26 require that copies of judicial findings of fact and conclusions of law and interrogatories in a pending dissolution action be sealed or sequestered when filed in another court's public records?

2. Does the First Amendment, United States Constitution, or article I, section 7, Iowa Constitution, support recognition of a newsperson's privilege, and if so, has Winegard met his burden to override such privilege?

■ I. Our opinion in the case of *In re Marriage of Winegard*, 257 N.W.2d 609 (Iowa 1977), unavoidably portrays the entire factual situation which inheres in the first above stated question. Therefore it is now moot and the second issue alone will be entertained.

II. Our scope of review is amply developed in *Hightower v. Peterson*, 235 N.W.2d 313, 316–317 (Iowa 1975), quoting *State v. Cullison*, 227 N.W.2d 121, 126 (Iowa 1975), and need not be repeated.

III. To what extent, if any, does the First Amendment protect confidentiality of newsperson's sources and information? Although this is a question of first impression in Iowa, it has evoked a flood of litigation and commentary elsewhere. Unfortunately, controversy has only increased since *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

Despite the fact *Branzburg* dealt with criminal proceedings and did not reach specifics of the subject now before us, the

Court did say, 408 U.S. at 704, 92 S.Ct. at 2668:

"Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' "

Even more pointedly *Schneider v. State of New Jersey,* 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939), says: "The freedom of speech and of the press secured by the First Amendment, U.S.C.A.Const., against abridgment by the United States is similarly secured to all persons by the Fourteenth against abridgment by a state."

In the same case, 308 U.S. at 161, 60 S.Ct. at 150-151, this observation appears:

*"This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.* (emphasis supplied).

"In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

The foregoing effectively negates Winegard's claim to the effect there is no such thing as a constitutionally based newsperson's privilege.

Looking to the other side of the coin it will be recalled Graham and the Register do not assert a newsperson enjoys an absolute privilege from testifying in a civil proceeding. In essence they take the position Judge Oxberger was right in recognizing existence of a qualified privilege, subordinated if the questioner meets a four-factor test.

Winegard counters by positing that in event this court finds any or all of the four standards enunciated below are applicable they were met and respondent judge acted illegally in holding otherwise. For reasons later set forth we agree.

■ IV. Although this court is persuaded there exists a fundamental newsperson privilege we are equally satisfied it is not absolute or unlimited.

■ Admittedly the majority opinion in *Branzburg* fixed upon strong public interest in effective law enforcement but it also recognized "the longstanding principle that 'the public . . . has a right to every man's evidence', except for those persons protected by a constitutional, common-law, or statutory privilege, * * *." 408 U.S. at 688, 92 S.Ct. at 2660.

■ So, absent a local statute regarding a newsperson's privilege we look to constitutional or common-law precepts.

■ As above indicated, Winegard's right to Graham's testimony can be predicated in large part if not entirely upon the longstanding principle that the public has a right to every person's evidence.

■ Nevertheless, where as in the case before us, there is a significant encroachment upon some given constitutional right, it can be justified only upon a subordinating state interest which is compelling. *Cf. Bates v. City of Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama,* 357 U.S. 449, 462–463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).

However, we are persuaded such requirement is presently satisfied in light of this theorem set forth in *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950):

"[P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty; which every person within the jurisdiction of the Government is bound to perform when properly summoned."

See also *Blackmer v. United States,* 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932).

And in *Garland v. Torre,* 259 F.2d 545, 548–549 (2d Cir. 1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231, then Circuit Court Judge Potter Stewart teachably stated:

"[F]reedom of the press, precious and vital though it is to a free society, is not an absolute. What must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom. That kind of determination often presents a 'delicate and difficult' task. *Schneider v. State of New Jersey,* 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 161, 84 L.Ed. 155; *American Communications Ass'n, C.I.O. v. Douds, supra,* 339 U.S. 382, at page 400, 70 S.Ct. 674, at page 684, 94 L.Ed. 925 (and see cases cited in that opinion at pages 398 and 399, at pages 683 and 684 respectively). The task in the present case, though perhaps delicate, does not seem difficult.

" 'Liberty, in each of its phrases, has its history and connotation.' *Near v. State of Minnesota, supra,* 283 U.S. at 697, page 708, 51 S.Ct. 625, at page 628, 75 L.Ed. 1357. Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press.

"It would be a needless exercise in pedantry to review here the historic development of that duty. Suffice it to state that at the foundation of the Republic the obligation of a witness to testify and the correlative right of a litigant to enlist judicial compulsion of testimony were recognized as incidents of the judicial power of the United States. *Blair v. United States,* 1919, 250 U.S. 273, 279–281, 39 S.Ct. 468, 63 L.Ed. 979; *Wilson v. United States,* 1911, 221 U.S. 361, 372–373, 31 S.Ct. 538, 55 L.Ed. 771; *Blackmer v. United States,* 1932, 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375; *United States v. Bryan,* 1950, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884. Whether or not freedom to invoke this judicial power be considered an element of Fifth Amendment due process, its essentiality to the fabric of our society is beyond controversy. As Chief Justice Hughes put it: '[O]ne of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned.' *Blackmer v. United States, supra,* 284 U.S. at page 438, 52 S.Ct. at page 255.

"Without question, the exaction of this duty impinges sometimes, if not always, upon the First Amendment freedoms of the witness. Material sacrifice and the invasion of personal privacy are implicit in its performance. The freedom to choose whether to speak or be silent disappears. But '[t]he personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of

the public.' *Blair v. United States, supra,* 250 U.S. at page 281, 39 S.Ct. at page 471.

"If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice."

▮ Mindful of the foregoing this court now holds there exists, in the present case, an undiluted compelling state interest of such persuasive force as to subordinate a newsperson's privilege to withhold confidential information.

V. Next to be resolved is the appropriate criteria upon which the above holding shall be presently applied.

▮ Our research reveals general usage of one or more of three qualifying standards which are, as commonly phrased:

(1) That the information is necessary or critical to the involved cause of action or defense pled. See, *e. g., Garland v. Torre,* 259 F.2d 545 (2d Cir. 1958); *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631 (1974), cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661; *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972); *Connecticut State Bd. of Labor Relations v. Fagin,* 33 Conn.Sup. 204, 370 A.2d 1095 (Super.Ct. 1976); *Schwartz v. Time, Inc.,* 71 Misc.2d 769, 337 N.Y.S.2d 125 (1972); *Brown v. Commonwealth,* 214 Va. 755, 204 S.E.2d 429 (1974), cert. denied, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182. As stated in *Garland,* 259 F.2d at 550, often quoted as authority for this standard, the information sought should go to the heart of the questioner's claim. *E. g., Apicella v. McNeil Labs.,* 66 F.R.D. 78, 81–82 (E.D.N.Y.1975).

(2) That other reasonable means available by which to obtain the information sought have been exhausted. See, *e. g., Bursey v. United States,* 466 F.2d 1059, 1083 (9th Cir. 1972); *Garland v. Torre,* 259 F.2d at 551; *Democratic National Committee v. McCord,* 356 F.Supp. 1394 at 1396–1397 (D.D.C.1973). *Cf. Shelton v. Tucker,* 364 U.S. 479, 489–490, 81 S.Ct. 247, 252–253, 5 L.Ed.2d 231 (1960).

(3) That it does not appear from the record the action or defense is patently frivolous. See, *e. g., Carey v. Hume, Bursey v. United States,* and *Cervantes v. Time, Inc.,* all cited above; *United States v. Liddy,* 354 F.Supp. 208 (D.D.C.1972).

These standards are hereby approved and adopted.

For purpose of clarity it is understood our holding today regarding a newsperson's privilege shall be deemed equally applicable to article I, section 7, of the Iowa Constitution. *Cf. Chicago Title Ins. Co. v. Huff,* 256 N.W.2d 17, 23 (Iowa 1977), and citations.

VI. Now to be determined is the legality of the order entered below in light of our adopted three-prong standard.

At the outset we are satisfied Winegard's basic discovery objective is necessary and critical to his cause of action against Schalk, et al. More specifically Winegard needs to know what was said to Graham and by whom. It is not for us, however, to presently resolve the subject matter relevancy of any discovery-related questions which have been or may be put to Graham by Winegard. Rather a determination thereof must be left to trial court in the first instance, guided by this standard.

In light of the foregoing there is another facet of this appeal which must be put to rest. As heretofore stated, one of the elements Winegard was required to establish as a discovery prerequisite relates to a showing by the questioner that other reasonable avenues of information have been exhausted.

Noticeably, Winegard's invasion of privacy and defamation action is against Sally's attorneys, the Schalk law firm, not against the Register and Graham. Furthermore, Winegard's petition focuses upon two articles prepared by Graham and published by the Register, with defendant Schalk therein clearly identified as the informant.

The record also reveals, as aforesaid the hearing upon which Judge Oxberger acted was held April 1, 1975. It further appears that as an adjunct thereof Winegard filed his request for admissions, directed to

Schalk, and the latter's responses. See Iowa R.Civ.P. 124 and 127. In brief, these documents were made a part of the record and available to respondent judge at all times material to the discovery-based proceeding below. No useful purpose will be served by here reciting the inquiries addressed to Mr. Schalk and his responses. In essence, this party admitted having conversed with Graham by phone about Winegard's federal court action, but denied having made statements attributed to him by Graham's articles. Under these circumstances we find Winegard did reasonably exercise and exhaust other plausible avenues of information.

Although other discovery *methods* may have been available to Winegard we do not, in this case, find any alternate approach would have been more fruitful. Neither is it for us to dictate counsel's discovery tactics. As best determinable Graham and Schalk were sole participants in the above noted telephone conversation. Thus, absent any illumination by defendant Schalk on the subject of that conversation, Graham is apparently the only remaining person who could conceivably provide the information essential to Winegard's invasion of privacy and defamation action against Schalk and his associates.

Looking now to the third factor, this court cannot from this record say Winegard's action against Schalk and his co-defendants is facially frivolous or patently without merit.

Moreover, we find no cause to now hold Winegard is abusing "judicial process to force a wholesale disclosure of a newspaper's confidential sources of news * *." *Garland v. Torre,* 259 F.2d at 549. Neither does there appear any basis upon which to at this time hold Winegard embarked upon or has pursued a course designed to annoy, embarrass or oppress Graham. See *Garland,* 259 F.2d at 551.

Judge Oxberger exceeded his jurisdiction or otherwise acted illegally in overruling Winegard's motion to compel discovery by deposition of Diane Graham.

VII. Because of existing peculiar circumstances set forth in Division I hereof, no useful purpose will be served by continuing in force and effect any sequestration order or orders heretofore entered by this court in connection with the instant appeal, therefore they are hereby set aside and annulled. This shall not, however, be deemed to create any precedent as to the scope and application of Code § 598.26.

WRIT SUSTAINED.

All Justices concur.