GREGORY, Circuit Judge,
dissenting as to Issue I:
Today we consider the importance of a free press in ensuring the informed public debate critical to citizens’ oversight of their democratically elected representatives. Undoubtedly, the revelation of some government secrets is too damaging to our country’s national security to warrant protection by evidentiary privilege. Yet the trial by press of secret government actions can expose misguided policies, poor planning, and worse. More importantly, a free and vigorous press is an indispensable part of a system of democratic government. Our country’s Founders established the First Amendment’s guarantee of a free press as a recognition that a government unaccountable to public discourse renders that essential element of democracy — the vote — meaningless. The majority reads narrowly the law governing the protection of a reporter from revealing his sources, a decision that is, in my view, contrary to the will and wisdom of our Founders.
The district court ruled that under Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and subsequent precedent from this Circuit, the Government could not compel Risen to reveal his source for chapter nine of his book, State of War. We review de novo the district court’s legal determination that the reporter’s privilege exists in the criminal context, and we examine the district court’s application of that privilege to the instant facts under a deferential abuse-of-discretion standard.[1] Church of Scientology Int’l v. Daniels, 992 F.2d 1329, 1334 (4th Cir.1993); LaRouche v. Nat’l Broad. Co., 780 F.2d 1134, 1139 (4th Cir.1986).
A.
The freedom of the press is one of our Constitution’s most important and salutary contributions to human history. See U.S. Const, amend. I (“Congress shall make no law ... abridging the freedom of speech, or of the press[.]”). Reporters are “viewed ‘as surrogates for the public,”’ United States v. Criden, 633 F.2d 346, 355 (3d Cir.1980) (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)), who act in the public interest by uncovering wrongdoing by business and government alike. Democracy without information about the activities of the government is hardly a democracy. The press provides “a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.” Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). A citizen’s right to vote, our most basic democratic principle, is ren *521 dered meaningless if the ruling government is not subjected to a free press’s “organized, expert scrutiny of government.” Justice Potter Stewart, Or of the Press, 26 Hastings L.J. 681, 634 (1975).
The protection of confidential sources is “necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain.” Ashcraft v. Conoco, Inc., 218 F.3d 282, 287 (4th Cir.2000). If reporters are compelled to divulge their confidential sources, “the free flow of newsworthy information would be restrained and the public’s understanding of important issues and events would be hampered in ways inconsistent with a healthy republic.” Id.; see also Zerilli v. Smith, 656 F.2d 705, 711 (D.C.Cir.1981) (“Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability” and threaten “a vital source of information,” leaving citizens “far less able to make informed political, social, and economic choices.”).
Yet if a free press is a necessary condition of a vibrant democracy, it nevertheless has its limits. “[T]he reporter’s privilege ... is not absolute and will be overcome whenever society’s need for the confidential information in question outweighs the intrusion on the reporter’s First Amendment interests.” Ashcraft, 218 F.3d at 287. And we must be mindful of the “fundamental maxim that the public ... has a right to every man’s evidence.” Jaffee v. Redmond, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quoting United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)).
The public, of course, does not have a right to see all classified information held by our government. But public debate on American military and intelligence methods is a critical element of public oversight of our government. Protecting the reporter’s privilege ensures the informed public discussion of important moral, legal, and strategic issues. Public debate helps our government act in accordance with our Constitution and our values. Given the unprecedented volume • of information available in the digital age — including information considered classified — it is important for journalists to have the ability to elicit and convey to the public an informed narrative filled with detail and context. Such reporting is critical to the way our citizens obtain information about what is being done in their name by the government.
A reporter’s need for keeping sources confidential is not hypothetical. The record on appeal contains affidavits proffered by Risen detailing the integral role of confidential sources in the newsgathering process. Scott Armstrong, executive director of the Information Trust and former Washington Post reporter, points to three ways in which investigative journalism uses confidential sources: “developing factual accounts and documentation unknown to the public,” “takfing] a mix of known facts and new information and produc[ing] an interpretation previously unavailable to the public,” and “publicizing] information developed in government investigations that has not been known to the public and might well be suppressed.” Joint App’x (J.A.) 531. “It would be rare,” Armstrong asserts, “for there not to be multiple sources — including confidential sources— for news stories on highly sensitive topics.” Id. In turn, “[m]any sources require such guarantees of confidentiality before any extensive exchange of information is permitted.” J.A. 350. Such guarantees of confidentiality enable sources to discuss “sensitive matters such as major policy debates, personnel matters, investigations of improprieties, and financial and budget matters.” Id. Even in ordinary daily reporting, confidential sources are critical. *522 “[Official government pronouncements must be verified before they are published,” and this is frequently done through discussion with officials not authorized to speak on the subject but who rely on assurances of confidentiality. J.A. 352. These discussions can often lead to “unique and relevant, contextual comments” made by the confidential source, comments that deepen the story. Id.
The affidavits also recount numerous instances in which the confidentiality promised to sources was integral to a reporter’s development of major stories critical to informing the public of the government’s actions. See, e.g., J.A. 378-80 (affidavit of Dana Priest) (noting, among many stories, her reporting on the existence and treatment of military prisoners at Guantanamo Bay, Cuba; the abuse of prisoners in Abu Ghraib, Iraq; the existence of secret CIA prisons in Eastern Europe; and the “systematic lack-of adequate care” for veterans at Walter Reed Army Medical Center relied upon confidential sources). Carl Bernstein, who has worked for the Washington Post and ABC News, writes that without his confidential source known as “Deep Throat,” the investigation into the Watergate scandal — the break-in of the Democratic National Committee’s offices in the Watergate Hotel and Office Building that led to the resignation of President Nixon — -would never have been possible. J.A. 361-62. “Total and absolute confidentiality” was essential for Bernstein to cultivate the source. J.A. 362.
■ For all that the record establishes, common sense tells us the value of the reporter’s privilege to journalism is one of the highest order. See Riley v. City of Chester, 612 F.2d 708, 714 (3d Cir.1979) (“The interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring.”). Indeed, reporters “depend[ ] upon an atmosphere of confidentiality and trust” to carry out their mission, a mission critical to an informed and functioning democracy. Jaffee, 518 U.S. at 10, 116 SiCt. 1923.
B.
Any consideration of the reporter’s privilege must start with Branzburg, where the Supreme Court upheld, by a vote of five to four, the compulsion of confidential source information from reporters. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The majority opinion highlighted the “longstanding principle that ‘the public ... has a right to every man’s evidence,’ except for those persons protected by a constitutional, common law, or statutory privilege.” Id. at 688, 92 S.Ct. 2646 (citations omitted). The opinion also stated that “news gathering is not without its First Amendment protections,” id. at 707, 92 S.Ct. 2646, but the Court did not specify exactly what those protections might encompass, although it indicated that “[ojfficial harassment of the press” and bad faith investigations might fall within the parameters of the First Amendment’s protection of reporters. Id. at 707-08, 92 S.Ct. 2646.
Further complicating matters is Justice Powell’s “enigmatic concurring opinion,” id. at 725, 92 S.Ct. 2646 (Stewart, J., dissenting), which is in part at odds with the majority opinion he joined. In the concurrence, Justice Powell emphasized “the limited nature of the Court’s holding,” and endorsed ■ a balancing test, according to which “if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation,” then courts should consider the applicability of the reporter’s privilege on a “case-by-case basis” by “the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with *523 respect to criminal conduct.” Id. at 709-10, 92 S.Ct. 2646 (Powell, J., concurring).
The full import of Justice Powell’s concurrence continues to be debated. Some analogize the Branzburg majority opinion to a plurality opinion, and therefore assert Justice Powell’s concurrence as the narrowest opinion is controlling. See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1148 (D.C.Cir.2006) (describing appellants’ argument that in a five-to-four decision, “the opinion of the least encompassing justice [] determines the precedent set by the decision”); cf. McKoy v. North Carolina, 494 U.S. 433, 462 n. 3, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (arguing that a separate opinion “cannot add to what the majority opinion holds, binding the other four Justices to what they have not said; but it can assuredly narrow what the majority opinion holds, by explaining the more limited interpretation adopted by a necessary member of that majority”) (Scalia, J., dissenting). Others, like my good friends in the majority, treat Justice Powell’s concurrence as ancillary, see ante 495-96, and simply rejoin that “the meaning of a majority .opinion is to be found within the opinion itself.” McKoy, 494 U.S. at 448 n. 3, 110 S.Ct. 1227 (Blackmun, J., concurring).
Given this confusion, appellate courts have subsequently hewed closer to Justice Powell’s concurrence — and Justice Stewart’s dissent — than to the majority opinion, and a number of courts have since recognized a qualified reporter’s privilege, often utilizing a three-part balancing test. See, e.g., United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir.1986) (applying the reporter’s privilege in the criminal context); United States v. Burke, 700 F.2d 70, 76-77 (2d Cir.1983) (recognizing the qualified privilege in criminal cases); Zerilli v. Smith, 656 F.2d 705, 711-13 (D.C.Cir.1981) (applying the reporter’s privilege in a civil ease). Indeed, a mere five years after Branzburg, a federal court of appeals confidently asserted that the existence of a qualified reporter’s privilege was “no longer in doubt.” Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 437 (10th Cir.1977). In short, Justice Powell’s concurrence and the subsequent appellate history have made the lessons of Branzburg about as clear as mud.
The Fourth Circuit, like our sister circuits, has applied Justice Powell’s balancing test in analyzing whether to apply a reporter’s privilege to quash subpoenas seeking confidential source information from reporters. We first explicitly adopted Justice Powell’s balancing test in an en banc opinion in United States v. Steelhammer, 539 F.2d 373, 376 (4th Cir.1976) (Winter, J., dissenting), adopted by the court en banc, 561 F.2d 539, 540 (4th Cir.1977). Then in LaRouche, we applied the reporter’s privilege doctrine to a civil case, again citing Justice Powell’s concurrence in • Branzburg for authority. 780 F.2d at 1139. Following the lead of the Fifth Circuit, we applied a three-part test to help us balance the interests at stake in determining whether the reporter’s privilege should be applied; that is, we considered “(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information.” Id. (citing Miller v. Transamerican Press, Inc., 621 F.2d 721, modified, 628 F.2d 932 (5th Cir.1980)). We went on to find that there was no abuse of discretion when the district court denied LaRouche’s motion to compel discovery of a reporter’s sources because LaRouche “had not exhausted reasonable alternative means of obtaining [the] same information.” LaRouche, 780 F.2d at 1139.
In a subsequent case in the criminal context, In re Shain, four reporters in *524 South Carolina asserted the reporter’s privilege to protect information gleaned from interviews with a state legislator. 978 F.2d 850, 851-52 (4th Cir.1992). But applying Justice Powell’s principles, we rejected the reporters’ claim on the ground that none of the reporters asserted that the interviews were confidential, that there were agreements to refuse revealing the identity of the interviewee, or that the government sought to harass the reporters. Id. at 853. Thus, although the reporter’s privilege was not recognized in “the circumstances of this case,” see id. at 854, it is clear to me that we have acknowledged that a reporter’s privilege attaches in criminal proceedings given the right circumstances.
The most recent federal appellate court decision to address the reporter’s privilege at length is In re Grand Jury Subpoena Judith Miller, 438 F.3d 1141, 1145-49 (D.C.Cir.2006). In that case, the court rejected the reporter’s privilege claim asserted by Judith Miller of The New York Times, stating that the Branzburg decision was dispositive. The majority there — as in this case — reasoned that the Supreme Court had not revisited the question of a reporter’s privilege under the First Amendment after Branzburg, and that Justice Powell’s concurrence did not detract from the precedential weight of the majority’s conclusion that there was no First Amendment reporter’s privilege, at least when there was no suggestion that the reporter was being pressed for information as a means of harassment or intimidation. Id. at 1145-49. In a thoughtful concurrence, though, Judge Tatel pointed to the ambiguities of the Branzburg decision, and noted that nearly every state and the District of Columbia has recognized a reporter’s privilege. Nevertheless, Judge Tatel concluded that “if Branzburg is to be limited or distinguished in the circumstances of this case, we must leave that task to the Supreme Court.” Id. at 1166 (Tatel, J., concurring). And although he felt constrained to deny applying a First Amendment privilege, Judge Tatel would have held that Rule 501 of the Federal Rules of Evidence provides for a reporter’s privilege (though on the facts of that case, the privilege would have given way due to the extraordinary national security issue involved). See id. at 1177-78 (Tatel, J., concurring).
C.
On this background, I turn to the question now before the court: Are there circumstances in which a reporter may refuse to testify as to the identity of one of his confidential sources, when the government seeks this information as part of a criminal investigation, and there is no evidence of prosecutorial bad faith or harassment? Some appellate courts have used a three-part test, essentially identical to the test we announced in LaRouche in the civil context, to help determine whether to apply the reporter’s privilege in criminal cases. See, e.g., United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir.1986); United States v. Burke, 700 F.2d 70, 76-77 (2d Cir.1983). They require the moving party, i.e. the government, “to make a clear and specific showing” that the subpoenaed information is “highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.” Burke, 700 F.2d at 77 (internal citations and quotation marks omitted). Cf. 28 C.F.R. § 50.10 (policy in regards to the issuance of subpoenas to members of the news media).
I, too, would recognize a qualified reporter’s privilege in the criminal context, and evaluate the privilege using the three-part test enunciated in LaRouche as an “aid” to help “balance the interests involved.” 780 F.2d at 1139. I would add a caveat to this general rule, however; in cases involving questions of national security, if the three-part LaRouche test is *525 satisfied in favor of the reporter’s privilege, I would require consideration of two additional factors: the harm caused by the public dissemination of the information, and the newsworthiness of the information conveyed.[2] Cf. id. at 1139 (establishing a balancing test for the reporter’s privilege in the civil context); In re Grand Jury Subpoena, Judith Miller, 438 F.3d at 1175 (Tatel, J., concurring) (stating that courts must “weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information’s value”). Thus, even when the LaRouche test favors recognizing the reporter’s privilege, in matters of national security this privilege can still be overridden by pressing government interests. It is important to note that such a test does not depart from established precedent, to the contrary, it adheres to Justice Powell’s concurrence in Branzburg that “[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.” 408 U.S. at 710, 92 S.Ct. 2646 (Powell, J., concurring).
D.
Whatever the limits of who may claim reporter’s privilege, it is clear that Risen— a full-time reporter for a national news publication, The New York Times — falls into the category of people who should be eligible to invoke the privilege. I also note that Risen has been offered immunity by the Government, so there is no Fifth Amendment issue with regard to compulsion of his testimony. The threshold inquiries having been satisfied, I turn to the question of whether the reporter’s privilege should apply in this case, applying the test I announced herein.[3]
1.
The inquiry when applying the first LaRouche factor is the relevance of Risen’s testimony to the Government’s case. Unlike the Branzburg case, where the reporters had knowledge of suspected crimes that could be seriously damaging to individuals and the government, the Government here seeks a conviction for the very act of disclosure. The Government claims that Risen’s testimony is valuable to its case against Sterling for revealing national defense secrets for two reasons: establishing venue and supporting the Government’s case on the merits. With respect to the former, the Government bears the burden of proving by a preponderance of the evidence that “the essential conduct elements” of the charged offenses occurred within the Eastern District of Virginia. United States v. Ebersole, 411 F.3d 517, 524 (4th Cir.2005) (internal quotation marks omitted).
*526 The record suggests the Government can show that Risen made phone calls from the Eastern District of Virginia to Sterling’s Missouri residence. Furthermore, emails exchanged with Sterling used a server located in the Eastern District of Virginia. Of course, in order to prove venue, the Government must show that classified information was disclosed during these communications. It appears venue can be established without requiring Risen to disclose his confidential sources, limiting the relevance of his testimony. And as addressed below with regard to the value of Risen’s testimony to the Government’s case-in-chief, the circumstantial evidence that classified information was discussed appears to be strong,[4] indicating that Risen’s testimony regarding his confidential sources is by no means pertinent to the Government proving Sterling guilty.
2.
Turning to the second LaRouche factor, whether the information sought — the identity of the source of the leak — is available by other means, the Government claims Risen’s testimony is a critical part of its case against Sterling largely because Risen is the only eyewitness to the crime; the other evidence is circumstantial.[5] The Government’s demonstration of its good-faith effort to- obtain similar evidence through other means is a necessary part of its showing. See United States v. Cuthbertson, 651 F.2d 189,195-96 (3d Cir.1981) (requiring a demonstration that the party seeking to overcome the reporter’s privilege “demonstrate that he has made an effort to obtain the information from other sources”) (quoting Criden, 633 F.2d at 358-59). But it is precisely because of the Government’s diligence that it doth protest too much. An analysis of the circumstantial evidence shows the Government’s case is not as weak as it or the majority claims, limiting the need for Risen’s testimony.
First, the Government can demonstrate that Sterling showed Risen’s book to Sterling’s then-girlfriend in a bookstore and, without so much as opening it, Sterling told her that chapter nine discussed his work at the CIA.[6] The book itself reveals *527 details about Classified Program No. 1 that tend to link Sterling to chapter nine. For example, sections of the chapter are told from the point of view of the case officer responsible for Human Asset No. 1 — which was Sterling’s responsibility— and the Government asserts that the chapter describes two classified meetings at which Sterling was the only common attendee.
Second, the Government has the aforementioned phone records demonstrating that Sterling and Risen called each other seven times between February 27 and March 31, 2003. The Government also has evidence that Sterling attempted to delete emails referencing meetings and shared information between Sterling and Risen, and parts of the emails were indeed obliterated. In one email that was not fully deleted, Risen asks Sterling, “Can we get together in early January?” J.A. 40. In another, Risen tells Sterling “I want to call you today[.] I’m trying to write the story.... I need your telephone number again.” J.A. 40. Risen sent another email to Sterling, this time stating “I’m sorry if I failed you so far but I really enjoy talking to you and would like to continue,” J.A. 41, an apparent reference to The New York Times’s refusal to publish Risen’s story on Classified Program No. 1.
Third, the prosecution expects to elicit at trial the testimony of a former United States intelligence official. Risen allegedly told this official, who occasionally discussed Risen’s reporting with him, that Sterling was involved in recruiting a source for “an important operation” that “targeted [ ] the Iranian nuclear program,” and that Sterling was frustrated by the perceived lack of recognition he received within the CIA for his efforts. Joint Classified App’x (J.C.A.) 622, 624-25. This official, the district court wrote, “told the grand jury that Risen had told him that Sterling was his source for information about the Iranian nuclear weapons operation.”
Finally, the Government can also link Risen and Sterling in the reporting of classified information on a prior occasion: Risen’s March 2002 New York Times article entitled “Fired by the C.I.A., He Says Agency Practiced Bias” noted that Sterling provided Risen with one of Sterling’s classified performance evaluations. In short, the Government has made “[a]ll reasonable attempts ... to obtain information from alternative sources” as recommended by the Department of Justice’s internal guidelines on subpoenas for testimony by news media, see 28 C.F.R. § 50.10. The Government’s efforts have yielded multiple evidentiary avenues that, when presented together, may be used to establish what the Government sought to establish solely with testimony from Risen — that Sterling leaked classified information, rendering Risen’s testimony regarding his confidential sources superfluous.
3.
The third LaRouche factor is whether the Government has a compelling interest in the information it seeks from Risen. Suffice it to say, the prosecution’s body of evidence without Risen’s testimony is strong.[7] The frequency of the phone calls between Risen and Sterling, the forensically retrieved emails, the stories published in The New York Times, the testimony of a former United States intelligence official, and the bookstore eyewitness provide extensive circumstantial evidence of the *528 crime and the court’s venue. While Sterling may argue that other staff members who had access to national security information could have been the source of the leak, the Government, as it acknowledges, may simply call to the stand those staff members to ask whether they were Risen’s source.
While the prosecution would undoubtedly be better off with Risen’s testimony— none of the remaining pieces of evidence is a smoking gun — the balancing test cannot mean that the privilege yields simply because “no circumstantial evidence, or combination thereof, is as probative as Risen’s testimony or as certain to foreclose the possibility of reasonable doubt.”[8] Brief for the United States at 14. The specificity of the information contained in chapter nine of Risen’s book, coupled with the limited universe of individuals who had access to the information, the circumstantial evidence, and proof by negative implication, compose a reasonably strong case for the Government. As we have stated before, “circumstantial evidence is no less probative than direct evidence.” Stamper v. Muncie, 944 F.2d 170, 174 (4th Cir.1991). I would therefore conclude that the Government has failed to demonstrate a sufficiently compelling need for Risen’s testimony.
4.
Satisfied that the LaRouche factors weigh in favor of Risen’s privilege from testifying as to his confidential sources, I turn next to newsworthiness and harm, the two additional factors I suggest should apply in a case involving national security information. On the present record, the newsworthiness of the leaked information appears to be substantial. The information contained in chapter nine of State of War covers the United States intelligence community’s efforts concerning the development of the Iranian nuclear program. The chapter questions the competence of the CIA’s management of Classified Program No. 1. Chapter nine discusses a plan to have a former Rüssian scientist give Iranian officials incorrect nuclear weapon design specifications in an attempt to determine the status of the Iranian nuclear weapons program, and to stall or thwart the progress of that program, perhaps for years. The blueprints were so deficient, the chapter opines, that the Russian scientist spotted a flaw almost immediately. Although the scientist explained this flaw to the CIA, Risen writes, the CIA proceeded with the plot. In a letter accompanying the blueprints, the Russian scientist disclosed to the Iranians the flaw he spotted in the plans. Because the Iranians had received scientific help from Russian and Chinese scientists, the chapter continues, and because Iran already had black market nuclear blueprints, Iranian scientists could likely differentiate the good from the flawed in the American blueprints. In other words, Risen asserts, Classified Operation No. 1 may have helped Iran advance its nuclear program. The chapter also describes the inadvertent disclosure to an Iranian double-agent of the identities of every spy the CIA had within Iran — information that was then turned over to Iranian security officials, who in turn arrested a number of those agents. Finally, the chapter recounts the CIA’s inability to obtain more than “fragmentary information *529 about Iran’s nuclear program.” J.S.A. 208.
This information is not extraneous. Quite the opposite, it portends to inform the reader of a blundered American intelligence mission in Iran. Since the United States’ invasion of Iraq in 2003, our nation’s focus has shifted to the nuclear capabilities of Iran, specifically whether Iran is attempting to build a nuclear bomb and how soon it can achieve the technical capabilities to do so. State of War was released in 2006 — three years after the Iraq invasion. The Iraq-invasion was undertaken in part based on concerns that Iraq had developed weapons of mass destruction, possibly including nuclear weaponry. See J.S.A. 182. The apparent lack of weapons of mass destruction in Iraq, it has been argued, highlights a significant failure of United States intelligence. See J.A. 381. Risen himself contributed to our understanding of this alleged failure. See James Risen, “C.I.A. Held Back Iraqi Arms Data, U.S. Officials Say,” The New York Times, July 6, 2001, at Al; J.S.A. 218-232 (chapter nine of State of War).
In a similar vein, Risen’s investigation into the methods and capabilities of the United States foreign intelligence community with respect to the Iranian nuclear program is surely news of the. highest import, particularly given the apparent contretemps made in the National Intelligence Estimate of 2007. See National Intelligence Council, National Intelligence Estimate, Iran: Nuclear Intentions and Capabilities (Nov. 2007), http://www.odni. gov/press_releases/20071203_release.pdf (asserting with, “high confidence” that Iran in 2003 halted its nuclear weapons program, despite 2005 intelligence estimate noting that Iran is “determined to develop nuclear weapons”). Significant public speculation about the possibility of a conflict with Iran has repeatedly surfaced in recent years. See Seymour M. Hersh, “Iran and the Bomb,” The New Yorker, June 6, 2011, http://www.newyorker.com/ reporting/2011/06/06/110606fa.facts.hersh (“There is a large body of evidence ... including some of America’s most highly classified intelligence assessments, suggesting that the United States could be in danger of repeating a mistake similar to the one made with Saddam Hussein’s Iraq eight years ago — allowing anxieties about the policies of a tyrannical regime to distort our estimations of the state’s military capabilities and intentions.”). Risen’s reporting on Iran’s nuclear capabilities is also particularly relevant given the criticism of the national press for its perceived failure to scrutinize United States intelligence regarding Iraq’s weapons capabilities. See James Risen, “C.I.A. Held Back Iraqi Arms Data, U.S. Officials Say,” N.Y. Times, July 6, 2004, at Al. Indeed, it is hard to imagine many subjects more deserving of public scrutiny and debate.[9]
*530 As a final step in the First Amendment inquiry, I would require the district court to balance the newsworthiness of the information against the harm caused by the leak.[10] The present record is not well developed on this point. • The district court understandably declined to conduct fact-finding on this issue because this factor had not been identified in prior case law. Moreover, the Government has not clearly articulated the nature, extent, and severity of the harm resulting from the leak.[11] Without such evidence, it is impossible for a reviewing court to determine whether the First Amendment interest in presenting newsworthy information to the public — if indeed the district court finds the information newsworthy — is outweighed by the consequences of the leak. Moreover, although I recognize the difficulty of evaluating the government’s interests in a case involving national security information, I am also mindful of the fact that “[t]he First Amendment interest in informed popular debate does not simply vanish at the invocation of the words ‘national security.’ ” United States v. Morison, 844 F.2d 1057, 1081 (4th Cir.1988) (Wilkinson, J., concurring). With all things considered, the district court was correct in holding that Risen was protected from disclosing his confidential sources by a First Amendment reporter’s privilege.
I find it sad that the majority departs from Justice Powell’s Branzburg concurrence and our established precedent to announce for the first time that the First Amendment provides no protection for reporters. Ante 496. Under the majority’s articulation of the reporter’s privilege, or lack thereof, absent a showing of bad faith by the government, a reporter can always be compelled against her will to reveal her confidential sources in a criminal trial. The majority exalts thé interests of the government while unduly trampling those of the press, and in doing so, severely impinges on the press and the free flow of information in our society. The First Amendment was designed to counteract the very result the majority reaches today. In sum, I would affirm the district court’s ruling as to Risen’s assertion of a First Amendment reporter’s privilege, albeit using the three-part LaRouche test and balancing the two additional factors identified herein: newsworthiness of the leaked information and the harm resulting from the leak.
E.
Even if I were not inclined to recognize a First Amendment privilege for a report *531 er in the criminal context given Branzburg, I would recognize a common law privilege protecting a reporter’s sources pursuant to Federal Rule of Evidence 501.[12] Rule 501 was promulgated three years after the Supreme Court’s decision in Branzburg. See Pub.L. No. 93-595, 88 Stat. 1926 (1975). The Rule authorizes federal courts to create new evidentiary privileges using the “common law ... in the light of reason and experience.” Fed. R.Evid. 501. The Rule “did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but, rather directed federal courts to ‘continue the evolutionary development of testimonial privileges.’ ” Jaffee v. Redmond, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quoting Trammel v. United States, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)). By adopting Rule 501, Congress has given authority to the courts to use case-by-ease adjudication to find new evidentiary privileges. United States v. Weber Aircraft Corp., 465 U.S. 792, 803 n. 25, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984) (“Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them.”). In light of Branzburg’s insistence that “Congress has freedom to determine whether a statutory newsman’s privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned,” 408 U.S. at 706, 92 S.Ct. 2646, a full discussion of the reporter’s privilege must reckon with Rule 501.
Testimonial privileges “are not lightly created nor expansively construed, for they are in derogation of the search for truth.” United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). But the Supreme Court and the circuit courts, using Rule 501, have recognized a number of testimonial privileges. See, e.g., Jaffee, 518 U.S. at 15, 116 S.Ct. 1923 (recognizing psychotherapist-patient privilege); Upjohn Co. v. United States, 449 U.S. 383, 386-90, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (recognizing attorney-client privilege); Trammel v. United States, 445 U.S. 40, 51-53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (recognizing marital communications privilege); Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc., 332 F.3d 976 (6th Cir.2003) (recognizing settlement communications privilege); Riley v. City of Chester, 612 F.2d 708, 715 (3d Cir.1979) (recognizing a qualified reporter’s privilege). All of these privileges are “distinctly exceptional,” and have only been recognized because they serve a “public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.” Jaffee, 518 U.S. at 9, 116 S.Ct. 1923 (internal quotation marks and citations omitted). In my view, the reporter-source privilege meets this high bar.
The Supreme Court has stated that “the policy decisions of the States bear on the question [of] whether federal courts should recognize a new privilege or amend coverage of an existing one,” and “[i]t is of no consequence that recognition of the privilege in the vast majority of States is the product of legislative action rather than judicial decision.” Id. at 12-13, 116 S.Ct. 1923. When the Branzburg decision issued, only seventeen states had recognized some protection for a reporter regarding his or her confidential sources. Branzburg, 408 U.S. at 689 n. 27, 92 S.Ct. 2646. *532 Today, only one state, Wyoming, has not enacted or adopted a reporter’s privilege. Thirty-nine states and the District of Columbia have shield laws for reporters, whether those shields are absolute or qualified. See Ala.Code § 12-21-142; Alaska Stat. § 09.25.300; Ariz.Rev.Stat. Ann. § 12-2237; Ark.Code Ann. § 16-85-510; Cal. Const. Art. I, § 2(b); Cal. Evid.Code § 1070; Colo.Rev.Stat. §§ 13-90-119, 24-72.5-101; Conn. Gen.Stat. Ann. § 52-146t; DeLCode Ann. tit. 10, § 4320; D.C.Code § 16-4701; Fla. Stat. § 90.5015; Ga.Code Ann. § 24-9-30; Haw.Rev.Stat. § 621, as amended by 2011 Haw. Sess. Laws ch. 113 (June 14, 2011); 735 111. Comp. Stat. 5/8-901; Ind.Code Ann. §§ 34-46-4-1, -2; Kan. Stat. Ann. § 60-480; Ky.Rev.Stat. Ann. § 421.100; La.Rev.Stat. Ann. § 45:1451; Md.Code Ann. Cts. & Jud. Proc. § 9-112; Mich. Comp. Laws § 767.5a; Minn.Stat. § 595.021; Mont. Code Ann. § 26-1-901; Neb.Rev.Stat. § 20-144; Nev.Rev.Stat. Ann. § 49.275; N.J. Stat. Ann. § 2A:84A-21; N.M. Stat. Ann. § 38-6-7; N.Y. Civ. Rights- Law § 79-h; N.C. GemStat. § 8-53.11; N.D. Cent.Code § 31-01-06.2; Ohio Rev.Code Ann. § 2739.12; Okla. Stat. Ann. tit. 12, § 2506; Or.Rev.Stat. § 44.510; 42 Pa. Cons.Stat. Ann. § 5942; R.I. Gen. Laws § 9-19.1-1; S.C.Code Ann. § 19-11-100; Tenn.Code Ann. § 24-1-208; Tex. Civ. Prac. & Rem.Code Ann. §§ 22.021-22.027; Utah Order 08-04 [Utah R. Evid. 509]; Wash. Rev.Code Ann. § 5.68.010; 2011 W. Va. Acts 78 (to be codified at W. Va.Code § 57-3-10); Wis. Stat. Am. § 885.14. In ten states without statutory shield laws, the privilege has been recognized in some form or another by the courts. See State v. Salsbury, 129 Idaho 307, 924 P.2d 208 (1996); Winegard v. Oxberger, 258 N.W.2d 847 (Iowa 1977), cert. denied, 436 U.S. 905, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978); In re Letellier, 578 A.2d 722 (Me.1990); In re John Doe Grand Jury Investigation, 410 Mass. 596, 574 N.E.2d 373 (1991); Sinnott v. Boston Retirement Bd., 402 Mass. 581, 524 N.E.2d 100, cert. denied, 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988); State ex rel. Classic III v. Ely, 954 S.W.2d 650, 653 (Mo.Ct.App.1997); State v. Siel, 122 N.H. 254, 444 A.2d 499 (1982); Hopewell v. Midcontinent Broad. Corp., 538 N.W.2d 780, 782 (S.D.1995), cert. denied, 519 U.S. 817, 117 S.Ct. 69, 136 L.Ed.2d 30 (1996); State v. St. Peter, 132 Vt. 266, 315 A.2d 254 (1974); Brown v. Commonwealth, 214 Va. 755, 204 S.E.2d 429 (1974); Hawkins v. Williams, No. 29,054 (Hinds County Circuit Court, Mississippi, Mar. 16, 1983) (unpublished). A number of these j urisdictions — Alabama, Arizona, California, Delaware, the District of Columbia, Indiana, Kentucky, Maryland, Montana, Nebraska, Nevada, New York, Ohio, Oklahoma, Oregon, and Pennsylvania — make the privilege an absolute bar to compelling a reporter to divulge his sources. On the basis of “the uniform judgment of the States,” the Supreme Court recognized the psychotherapist-patient privilege. Jaffee, 518 U.S. at 14, 116 S.Ct. 1923. The landscape in regards to the reporter’s privilege has changed drastically since Branzburg. The unanimity of the States compels my conclusion that Rule 501 calls for a reporter’s privilege.
F.
The paramount importance of the free press guaranteed by our Constitution compels me to conclude that the First Amendment encompasses a qualified reporter’s privilege. Using the factors identified herein and given the facts at hand, Risen must be protected from disclosing the identity of his confidential sources. This is consistent with Branzburg and the need for courts to balance “freedom of the press” against “the obligation of all citizens to give relevant testimony with respect to criminal conduct.” 408 U.S. at 724, 92 S.Ct. 2646 (Powell, J., concurring). Moreover, *533 given the near unanimity of the states with regard to a reporter’s privilege, I would recognize the privilege under Federal Rule of Evidence 501. Thus, I would affirm the district court’s order quashing the trial subpoena and denying the Government’s motion to admit Risen’s testimony as to the source relied upon by Risen for Chapter Nine of State of War. As to Issue I, then, I respectfully dissent from the majority’s holding.

. As the majority notes, we have jurisdiction pursuant to 18 U.S.C. § 3731.

. By "newsworthiness,” I mean the value to the public of the leaked information concerning the issues of the day. Necessarily included in the concept of "newsworthiness” is the recognition that because this privilege is qualified, it will likely deter some potential sources from disclosing their information. Because the newsworthiness of the information cannot be adjudged by a court at the time of disclosure, a source takes a chance that a court will not protect the source. While this is somewhat speculative — not all reporters with confidential sources are routinely subpoenaed — to the extent this is a problem, the potential of this chilling effect counsels a broad definition of "newsworthiness.” On the other hand, I would reject an absolute privilege because some discussions should be chilled — precisely those that seriously endanger individuals or our nation’s security without an outweighing, compelling civic benefit.

. I emphasize that these factual assertions have yet to be proven, and my analysis would not, even if it were the majority opinion, constrain the jury’s, resolution of disputed factual issues at trial.

. In determining the relevance of the evidence sought to be protected by the reporter’s privilege and whether the Government may prove its allegations by other means, we necessarily make a preliminary inquiry into the merits of the case, although such an inquiry is not equivalent to a judgment as a matter of law.

. As the district court stated, the privilege should extend to information that would lead the government to the identity of the confidential source. See United States v. Sterling, 818 F.Supp.2d 945, 955 (E.D.Va.2011) ("Courts have long held that the reporter’s privilege is not narrowly limited to protecting the reporter from disclosing the names of confidential sources, but also extends to information that could lead tó the discovery of a source’s identity."). That the coverage of the privilege should extend so far is commonsensical; otherwise, tile questions could be tailored to swallow the privilege. Cf. New York Times Co. v. Gonzales, 459 F.3d 160, 168 (2d Cir.2006) (recognizing that the subpoena of a reporter's phone records "is a first step of an inquiry into the identity” of the source and that a balancing test should be applied to determine whether the reporter’s privilege covers the records).

.The Government suggests that the bookstore witness is now (or was for a time) Sterling's wife, and argues that her testimony might not be admitted at trial because she might assert a testimonial privilege. See Trammel v. United States, 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (only the witness-spouse can assert the spousal privilege). Whether this testimony is subject to privilege is a question for the district court in the first instance, and I seek neither to answer this question nor to remove- from the district court's purview the ability to decide whether the testimony could properly be admitted.

. There may yet be further motions in limine challenging some of the evidence that the Government may wish to present at trial. I do not suggest a view one way or the other on the merits of any potential challenges; my analysis is limited to Risen’s claim of reporter's privilege.

. My good colleagues observe that circumstantial evidence is not always as effective as direct evidence. (Opinion of Traxler, C.J., at 49). I do not disagree. Rather, I observe that in this case, the circumstantial evidence proffered by the Government appears strong enough for the jury to draw a conclusion regarding the identity of Risen's source. I do not dispute that direct evidence would be more effective than circumstantial evidence to establish the identity of the source, but other factors are at play.

. The district court declined to consider newsworthiness as a factor in its ruling on reporter's privilege because no court had identified newsworthiness as a factor in the balancing test. The district court stated that considering newsworthiness would cause the court to "serve as editor-in-chief, unilaterally determining whether reporting is sufficiently accurate or newsworthy as to be deserving of First Amendment protection." United States v. Sterling, 818 F.Supp.2d 945, 954 (E.D.Va.2011). In the absence of precedential case law identifying this factor, it is understandable that the district court declined to consider newsworthiness. But I do not doubt the district court's ability to determine the value to the public of particular news stories. Courts already conduct this analysis in other First Amendment contexts; for example, when assessing restrictions on government employee speech. See, e.g., City of San Diego v. Roe, 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam) (requiring courts to evaluate the "legitimate news interest," meaning the "value and concern to the public at the time of publication”).

. I would find a reporter's claim of privilege to be at its strongest when the disclosure at issue covers governmental methods and policies that challenge what is moral, legal, and, broadly speaking, strategic for our government to do. Cf. In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1174 (D.C.Cir.2006) (Tatel, J., concurring in the judgment) ("It seems hard to imagine how the harm in leaking generic descriptions of [a top-secret satellite] program could outweigh the benefit of informing the public about billions of dollars wasted on technology considered duplicative and unnecessary by leading Senators from both parties.”). In contrast, I would find it unlikely that a reporter could avail himself of the privilege when the leak concerns "the design for a top secret nuclear weapon, for example, or plans for an imminent military strike.”. Id, at 1173 (Tatel, J., concurring). Such leaks convey little information useful to the public in its civic role yet present great risks to national, security.

. I am well aware that the revelation of classified government information can surely be among the most harmful of crimes. However, it is not the fact that the information is classified that renders the crime so harmful; the harm derives from the content of that information, and what is, or may be, done with the information if it falls into the wrong hands.

. To be sure, the district court ruled that the reporter’s privilege is a constitutional one guaranteed by the First Amendment. United States v. Sterling, 818 F.Supp.2d 945, 954. This court may, however, affirm on any grounds supported by the record. MM v. Sch. Dist. of Greenville Cnty,, 303 F.3d 523, 536 (4th Cir.2002).